UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

MARK CHEATWOOD                                                                    PLAINTIFF

v.                                        No. 2:19-CV-02088

DR. DANIEL MWANZA, et al.                                                  DEFENDANTS

## OPINION AND ORDER

Before the Court are three motions for summary judgment.  Separate Defendant Dr. Daniel

Mwanza filed a motion (Doc. 102) for summary judgment, a brief in support (Doc. 103), and

statement of facts (Doc. 104).  Plaintiff Mark Cheatwood filed a response (Doc. 142) and brief in

opposition (Doc. 143).  Mr. Cheatwood also filed a statement of disputed material facts (Doc. 141)

responsive to all motions for summary judgment.  Separately, Intervener The City of Fort Smith

("the City") filed a response (Doc. 136) and statement of facts (Doc. 140) to Dr. Mwanza's motion.

Dr. Mwanza filed a reply (Doc. 152) and Mr. Cheatwood, with leave of Court, filed a surreply

(Doc. 163).  Separate Defendant Fort Smith HMA, LLC ("Fort Smith HMA") filed a motion

(Doc. 109) for summary judgment, brief in support (Doc. 110), and statement of facts (Doc. 111).

Mr. Cheatwood filed a response (Doc. 149) and brief in opposition (Doc. 150).  Fort Smith HMA

filed a reply (Doc. 151).  Dr. Michelle Horan also filed a motion (Doc. 112) for summary

judgment, brief in support (Doc. 113), and statement of facts (Doc. 114).  The City filed a response

(Doc. 135) and brief in opposition (Doc. 137).  Mr. Cheatwood also filed a response (Doc. 144)

and brief in opposition (Doc. 145).  Dr. Horan filed a reply (Doc. 154).  For the reasons set forth

below Fort Smith HMA's motion (Doc. 109) will be GRANTED and Dr. Mwanza and Dr. Horan's

motions (Docs. 102, 112) will be DENIED.

## I.      Background

On July 10, 2017, Mr. Cheatwood, in the course of his employment for the City, was operating a boom truck to move a water pump from a flatbed trailer into a creek.  The boom truck was equipped with outriggers intended to stabilize the boom truck while picking up large items.  However, because of the location of the boom truck and the flatbed trailer, Mr. Cheatwood was not able to extend the outriggers to their fullest extent, and instead the outriggers were only extended to the "intermediate position."  (Doc. 112-5, p. 4).  Although Mr. Cheatwood had previously used the boom truck to lift similar pumps, he was unaware that this pump was heavier than those pumps or that the outriggers were not extended far enough to stabilize the boom truck.  As Mr. Cheatwood was lowering the pump into the creek, the boom truck tipped and Mr. Cheatwood fell between thirty and forty feet into the creek.  As a result of the fall, Mr. Cheatwood suffered a "right ankle closed fracture, open bimalleolar fracture of the left ankle, broken left wrist, closed burst fracture of the lumbar vertebra[,] and closed sternal fracture."  (Doc. 114, p. 1).

Mr. Cheatwood arrived by ambulance at 8:14 a.m. at the Sparks Regional Medical Center ("Sparks") emergency room.  Dr. Horan, the emergency room doctor, examined Mr. Cheatwood's injuries at 8:15 a.m.  After confirming pedal pulses were present in both the right and left lower extremities, Dr. Horan ordered Nurse Ben Yother to apply wet-to-dry dressings on Mr. Cheatwood's wound.  Per Dr. Horan's orders, IV pain medication was administered at 8:26 a.m.  Dr. Horan also ordered Ancef and Tdap antibiotics, and additional pain medication, which were administered to Mr. Cheatwood at 8:39 a.m.  A lumbar spine CT, x-rays of lower extremities, and an additional CT of Mr. Cheatwood's spine were ordered and completed by 9:13 a.m.

Dr. Horan paged the on-call orthopedic surgeon, Dr. John Harp, three times between 9:01 a.m. and 9:39 a.m.  Around 10:00 a.m., Dr. Horan was able to speak to Dr. Harp.  After Dr. Harp

reviewed the radiology studies, he scheduled Mr. Cheatwood for an irrigation and debridement ("I&D"), a type of wound cleaning performed while the patient is under general anesthesia, and an external fixation of the open fracture for 12:30 p.m.  At 10:11 a.m., Dr. Horan, at the direction of Dr. Harp paged the on-call general surgeon, Dr. Mwanza, to manage Mr. Cheatwood's care. Dr. Mwanza accepted the consult on Mr. Cheatwood at 10:19 a.m. and examined Mr. Cheatwood.

Dr. Horan also paged the on-call neurosurgeon, Dr. Arthur Johnson, at 9:38 a.m., and Dr. Johnson accepted the consult.  Dr. Johnson's physician assistant, Janet Canada, APN, examined Mr. Cheatwood.  Nurse Canada documented Mr. Cheatwood had a L4 chance fracture on his spine, and Dr. Johnson came to the emergency room to examine Mr. Cheatwood and review his radiology studies.

At 11:28 a.m., Dr. Mwanza admitted Mr. Cheatwood to the hospital.  Because Dr. Horan was an emergency room physician, she did not have privileges to admit patients to the hospital. Mr. Cheatwood was transferred to the operating room at 11:55 a.m. and a preoperative assessment was performed by Janis Shephard, R.N. and Dr. Deborah Moss, the anesthesiologist.  Dr. Johnson then informed Dr. Moss that Mr. Cheatwood's I&D surgery needed to be put on hold because Mr. Cheatwood's L4 fracture should be surgically stabilized before the I&D procedure.  It was Dr. Johnson's opinion that the spinal surgery needed to be performed using a surgical anterior approach.  However, no general surgeon on call was trained in performing anterior approaches. Because no general surgeon could perform an anterior approach, Dr. Mwanza entered an order to transfer Mr. Cheatwood to another facility, and Nurse Shephard documented the surgery cancellation at 1:50 p.m.

Dr. Horan was then contacted and asked to assist with Mr. Cheatwood's transfer arrangements.  Dr. Horan called the Arkansas Trauma Communications Center to find a hospital

that could take Mr. Cheatwood as a patient.  Caryl Cheatwood requested Mr. Cheatwood be transferred to a Tulsa hospital because of Tulsa's proximity to the Cheatwood home.  However, Mr. Cheatwood was not accepted for transfer at any Tulsa, Oklahoma hospital and instead was transferred to University of Arkansas Medical Systems ("UAMS").  Caryl Cheatwood signed a transfer request on behalf of Mr. Cheatwood that included the following language:

> I acknowledge that my medical condition has been evaluated and explained to me by the physician.  I desire a transfer to another facility.  Potential benefits and risks associated with this transfer have been explained and I fully understand them.  With this understanding, I choose to be transferred to another facility.

(Doc. 109-4, p. 1).

A medical helicopter transport was called at 1:57 p.m. and arrived at Sparks at 2:45 p.m. Mr. Cheatwood departed Sparks by helicopter at 3:04 p.m. and arrived at the UAMS emergency department at 4:28 p.m.  At 7:20 p.m. Mr. Cheatwood was admitted as a patient to UAMS.  At around 8:00 a.m. the following morning, Mr. Cheatwood underwent the I&D surgical procedure. On July 26, 2017, after undergoing four separate I&D procedures, Mr. Cheatwood's left leg and foot were amputated below the knee.

Plaintiff Mark Cheatwood and his wife Caryl Cheatwood filed this action on July 9, 2019, against Dr. Mwanza, Dr. Horan, Baptist Health FKA Sparks Regional Medical Center, unknown medical doctors 1-10, and unknown hospital staff 1-10.  The Cheatwoods alleged claims for medical malpractice, loss of consortium, and violations of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd.  Plaintiffs' original complaint lacked sufficient jurisdictional allegations and named the incorrect entity for Sparks.  Plaintiffs eventually filed a motion for leave to file a second amended complaint adding Fort Smith HMA, LLC and Community Health Systems Inc. as defendants.  Separate Defendants Baptist Health and Community Health Systems, Inc. were dismissed without prejudice pursuant to a joint stipulation

(Doc. 55), and Plaintiffs' claims against Unknown Medical Doctors 1-10 and Unknown Hospital Staff 1-10 were also dismissed without prejudice (Doc. 58).  On September 30, 2020, Plaintiff Caryl Cheatwood was dismissed as a plaintiff in this action pursuant to Federal Rule of Civil Procedure 41(a)(2).

## II.    Standard of Review

On a motion for summary judgment, the burden is on the moving party to show that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Once the movant has met its burden, the nonmovant must present specific facts showing a genuine dispute of material fact exists for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In order for there to be a genuine dispute of material fact, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66-67 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.   Analysis

### A.    EMTALA

Mr. Cheatwood's EMTALA claims against Fort Smith HMA will be dismissed.  EMTALA applies to hospitals that have executed a provider agreement under the Medicare program. *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1136 (8th Cir. 1996).  The purpose of EMTALA is to prevent "patient dumping," where hospitals refuse to treat patients in an emergency room if the patients do not have health insurance.  *Id.* at 1136-37.  EMTALA requires a hospital to screen patients who come to the hospital's emergency room, and to either provide the treatment required to stabilize the patient or transfer a patient if the hospital determines the patient has an emergency medical condition.  *Id.* at 1140.  For purposes of EMTALA, "emergency medical

5

condition" is defined as:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part.

42 U.S.C. § 1395dd(e)(1)(A). "Stabilize" means to provide medical treatment of the emergency medical condition "as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer." 42 U.S.C. § 1395dd(e)(3)(A).

To recover under EMTALA, a plaintiff must show the hospital actually knew the patient suffered from an emergency medical condition. *Summers*, 91 F.3d at 1140. If a patient is not stabilized, the patient can only be transferred if

> the individual makes a written request for transfer to another hospital or a physician has signed a certification that based on the medical information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and the transfer is an appropriate transfer.

*Guzman v. Mem'l Hermann Hosp. Sys.*, 637 F.Supp.2d 464, 478-79 (S.D. Tex. 2009) (internal citations and alterations omitted). The transfer requirements under EMTALA do not have to be satisfied if the patient is stabilized. *Id.*

If the hospital transfers the patient, the transfer must be an appropriate transfer. An appropriate transfer is defined as a transfer

> (A) in which the hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health . . .;
> (B) in which the receiving facility –
>   (i) has available space and qualified personnel for the treatment of the individual, and
>   (ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment;

(C) in which the transferring hospital sends to the receiving facility all medical records (or copies thereof), related to the emergency condition for which the individual has presented, available at the time of transfer . . .;

(D) in which the transfer is effected through qualified personnel and transportation equipment, as required including the use of necessary and medical appropriate life support measures during the transfer; and

(E) which meets such other requirements as the Secretary may find necessary in the interests of the health and safety of individuals transferred.

42 U.S.C. § 1395dd(c)(2). Thus, the elements for an EMTALA claim premised on inappropriate transfer are "(1) the patient had an emergency medical condition; (2) the hospital actually knew of that condition; (3) the patient was not stabilized before being transferred; and (4) the transferring hospital did not obtain the proper consent or certification before transfer and failed to follow appropriate transfer procedures." *Guzman*, 637 F.Supp.2d at 510.

The Department of Health and Human Services' Center for Medicare and Medicaid Services ("CMS") released regulations stating a hospital's duty under EMTALA ends "if the hospital admits the individual as an inpatient for further treatment." 42 C.F.R. § 489.24(a)(1)(ii). Further "if a hospital has screened an individual . . . and found that individual to have an emergency medical condition, and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities . . . with respect to that individual." 42 C.F.R. § 489.24(d)(2)(i). The Fourth, Ninth, and Eleventh Circuits have accorded this agency interpretation of EMTALA *Chevron* deference and held that EMTALA's requirements end when a patient is admitted to the hospital for inpatient treatment. *See Bryant v. Rectors & Visitors of The Univ. of Va*, 95 F.3d 349 (4th Cir. 1996); *Bryant v. Adventist Health Sys./West*, 289 F.3d 1162 (9th Cir. 2002); *Harry v. Marchant*, 291 F.3d 767 (11th Cir. 2002). The Eighth Circuit likely would agree. "When Congress has delegated authority to an administrative agency to interpret and implement a federal statute, we give the agency's interpretation deference pursuant to *Chevron*." *Beeler v. Astrue*, 651 F.3d 954, 959 (8th Cir. 2011) (citing *Chevron, U.S.A.,*

7

*Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). "Under *Chevron*, the agency's 'view governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation or even the interpretation deemed *most* reasonable by the courts.'" *Id.* (emphasis in original) (citing *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208 (2009)).

EMTALA does not expressly address if a hospital's obligations end once an individual is admitted to that hospital. EMTALA is an anti-patient dumping statute which "focuses on uniform treatment of patients presented in hospital emergency departments." *Hunt v. Lincoln Cty. Mem. Hosp.*, 317 F.3d 891, 894, n. 5 (8th Cir. 2003). The regulation ending EMTALA applicability following good faith admission to the hospital is compatible with the purpose of EMTALA. Because the regulation is not "arbitrary, capricious, [nor] manifestly contrary to" EMTALA, the Court finds it is a reasonable interpretation of EMTALA. *James v. Jefferson Regional*, No. 4:12CV267 JAR, 2012 WL 1684570, at *3 (E.D. Mo. May 15, 2020) (citing 42 C.F.R. § 489.24(a)(1)(ii)); *Quinn v. BJC Health Sys.*, 364 F. Supp. 2d 1046, 1054 (E.D. Mo. 2005).

Fort Smith HMA argues it is entitled to summary judgment on Plaintiff's EMTALA claim because Mr. Cheatwood was admitted to the hospital as a patient. Alternatively, Fort Smith HMA argues Mr. Cheatwood was stabilized before transfer, and even if Mr. Cheatwood was not admitted or stabilized, his transfer was a proper EMTALA transfer. Mr. Cheatwood does not dispute that Fort Smith HMA's duty ends when a patient is properly admitted. Instead he argues that his admission is an exception because he was not admitted in good faith. Courts have found when a hospital's admission of a patient is a "ruse to avoid EMTALA's requirements, then liability under EMTALA may attach." *Bryant*, 289 F.3d at 1169. Mr. Cheatwood argues his admission could not have been in good faith because (1) Defendants knew an anterior approach could not be performed; (2) Mr. Cheatwood's open facture should have been irrigated; (3) the I&D procedure

should have been performed; (4) no alterative treatments were discussed; and (5) Sparks performed a "wallet biopsy" and determined any surgery would not be profitable.  (Doc. 150, pp. 4-9).

Neither the facts in the record nor reasonable inferences drawn from them support Mr. Cheatwood's arguments.  That appropriate medical treatment could not be performed may show malpractice, but even if Defendants were negligent, no reasonable juror could find that Mr. Cheatwood's admission to the hospital was a ruse or was otherwise done in bad faith to avoid EMTALA's requirements.  Additionally, Mr. Cheatwood's argument that Defendants did a "wallet biopsy," determined Mr. Cheatwood's treatment would be too expensive, and that this was the motivation for Defendants to avoid EMTALA's requirements is entirely without support in the record.[1]  A nonmovant cannot avoid summary judgment with baseless arguments.  Because Mr. Cheatwood was admitted to the hospital after presenting at the emergency room, Fort Smith HMA's EMTALA duty ended and Fort Smith HMA is entitled to summary judgment on Mr. Cheatwood's inappropriate transfer EMTALA claim.

Even if Mr. Cheatwood had not been admitted (or if his admission were not enough to end Fort Smith HMA's EMTALA duties), and further assuming Mr. Cheatwood is correct in arguing that he was not stabilized prior to his transfer to UAMS, the transfer was nevertheless appropriate.  EMTALA allows a hospital to transfer a patient if the requirements of § 1395dd(c) are satisfied.

---

[1] Mr. Cheatwood's response argues the Defendants wanted to "ship [Mr. Cheatwood] off and make him some other hospital's problem as soon as they possibly could so they could focus on more elective, and thus more profitable surgeries."  (Doc. 150, p. 7).  His argument does not explain why, if this is the case, Defendants admitted him to the hospital and scheduled diagnostics and treatment before ultimately transferring him.  Additionally, Mr. Cheatwood's attorney has had ample opportunity to engage in discovery on behalf of his client, but he does not provide any evidentiary support for his accusation that Defendants' transfer decisions were based on a "wallet biopsy."  After careful review of the record, it is difficult to maintain the presumption that this argument is based on inquiry reasonable under the circumstances.  However because no party has asked for Rule 11 sanctions, the Court will not address the matter further.

Here, a transfer request form was signed by Caryl Cheatwood and Dr. Horan, and UAMS had available space, qualified personnel, and agreed to accept Mr. Cheatwood as a patient.

###    B.    Respondeat Superior

Mr. Cheatwood's medical malpractice claims against Fort Smith HMA will also be dismissed.  Arkansas's medical malpractice statute provides

> When a medical care provider is a codefendant with a medical care facility in an action for medical injury, and the only reason for naming the facility as a defendant is that the defendant medical care provider practices in the facility, the plaintiff shall have the burden of proving that the defendant medical care provider is the employee of the facility before the facility may be held liable for the medical care provider's negligence, if any is proven.

Ark. Code Ann. § 16-114-210.  Fort Smith HMA, known at the time as Sparks Regional Medical Center, is the only medical care facility remaining as a defendant in this action.  Fort Smith HMA argues Plaintiff has not met his burden to show either Dr. Horan or Dr. Mwanza were Fort Smith HMA's employees.

Fort Smith HMA argues Dr. Horan was not its employee because she was a partner in Emergency Medical Services Group, P.A., which (through EmCare, Inc.) provided emergency physicians for contract work in the Sparks emergency room.  Mr. Cheatwood agrees that Dr. Horan was not Fort Smith HMA's employee.  Accordingly, Fort Smith HMA cannot be liable for any malpractice by Dr. Horan on a theory of respondeat superior.

Fort Smith HMA also argues Dr. Mwanza was not its employee, but was instead the employee of Fort Smith HMA PBC Management LLC ("HMA PBC"), a separate business entity that employed the physicians who worked at Fort Smith HMA's hospital.[2]  Mr. Cheatwood argues

---

[2] A search of the Arkansas Secretary of State's website reveals four entities that begin with the term "Fort Smith HMA."  Those entities are: (1) Fort Smith HMA, LLC; (2) Fort Smith HMA PBC Management, LLC; (3) Fort Smith HMA Physician Management, LLC; and (4) Fort Smith HMA Home Health, LLC.  (Doc. 151-2).

a question of fact remains as to Dr. Mwanza's employment because Dr. Mwanza testified at his deposition that he was an employee of Sparks and because no employment contract has been produced. Although Dr. Mwanza testified that he was an employee of Sparks, he clarified that he was an employee of HMA PBC, and his original discovery responses stated he was not employed by Fort Smith HMA. Further, HMA PBC's description on the Arkansas Secretary of State's website reflects HMA PBC also did business under the name "Sparks."

To carry his burden at trial, Mr. Cheatwood would have to do more than show Dr. Mwanza worked for "Sparks." He would have to show that Dr. Mwanza was an employee of Fort Smith HMA, the entity he seeks to hold liable through a theory of respondeat superior. To overcome summary judgment and go to trial on this issue, Mr. Cheatwood must show that his dispute over the identity of Dr. Mwanza's employer (a material fact) is a *genuine* dispute.

Mr. Cheatwood's complaint that no employment contract was produced for Dr. Mwanza despite Mr. Cheatwood's request to Dr. Mwanza during deposition that Dr. Mwanza produce the contract does not save Mr. Cheatwood from summary judgment on this issue. Mr. Cheatwood could have filed a motion to compel Dr. Mwanza to produce his employment contract if it was not produced. Alternatively, Mr. Cheatwood could have followed clear guidance from the Court (Doc. 30, p. 3) to avoid any confusion caused by the structure of the business entities related to Fort Smith HMA and identify the correct employer. When Mr. Cheatwood had difficulty naming the correct business entities as defendants at the outset of this lawsuit (a difficulty that was compounded by the recent purchase of Sparks Regional Medical Center by Baptist Health), the Court directed Mr. Cheatwood's attention to another case on the Court's docket—*Titsworth v. Anderson, et al.*, 2:18-cv-02111 (W.D. Ark.). If Plaintiff's counsel had examined the public docket in *Titsworth*, he would have discovered Fort Smith HMA, LLC is the entity that operated Sparks

Regional Medical Center and Fort Smith HMA PBC Management, LLC is the entity that employed physicians to provide medical care at Fort Smith HMA's various facilities.  (*Titsworth*, Doc. 186, p. 5).  Mr. Cheatwood's failure to discover and name the correct employer business entity as a Defendant here despite guidance from the Court, or to subpoena HMA PBC for a copy of Dr. Mwanza's employment contract, or even to move for an order compelling Dr. Mwanza to produce his employment contract all reflect a lack of diligence by Mr. Cheatwood.  This lack of diligence to find evidence showing Dr. Mwanza was employed by Fort Smith HMA does not give rise to a *genuine* dispute about that issue sufficient to overcome summary judgment.

Mr. Cheatwood alternatively argues that because no employment contract has been produced, it is clear that, "Mwanza was employed by the Fort Smith system using a subsidiary in order to attempt to avoid agency and therefore liability."  (Doc. 150, p. 10).  Although the various Fort Smith HMA entities are related, Plaintiff has not demonstrated that the entities are either so identical and comingled or that the business structure of these entities was utilized to perpetrate fraud or crime such that the veil between them should be pierced.  *Cf. Anderson v. Stewart*, 234 S.W.3d 295, 298 (Ark. 2006) (identifying situations where piercing the corporate veil might be appropriate).  "All corporations, regardless of the fact that the holders of stock and the officers of the corporation are identical, are separate and distinct legal entities; and it follows that, in the absence of facts on which liability can be predicated, one such corporation is not liable for the debts of another."  *Larco, Inc. v. Strebeck*, 379 S.W.3d 16, 21 (Ark. App. 2010) (citing *K.C. Props. of Nw. Ark., Inc. v. Lowell Inv. Partners, LLC*, 280 S.W.3d 1 (Ark. 2008)).  "The facts that two corporations are practically under the control of the same persons . . . and that the two corporations have intimate business relations do not prove that the two corporations are in fact one and the same."  *Id.*  A corporation is separate and distinct from other corporations with which the

corporation may be connected. *Id.*

No reasonable juror could find Dr. Mwanza was an employee of Fort Smith HMA. Because neither Dr. Mwanza nor Dr. Horan were employees of Fort Smith HMA, any medical malpractice claim Mr. Cheatwood has against Fort Smith HMA must be dismissed. To the extent that Mr. Cheatwood persists in a negligent supervision of employees claim against Fort Smith HMA, that claim must also be dismissed because neither Dr. Mwanza nor Dr. Horan is an employee of Fort Smith HMA. *See Paulino v. QHG of Springdale, Inc.*, 386 S.W.3d 462, 468 (Ark. 2012) ("In order to recover under a theory of negligent supervision, a plaintiff must show that an employer knew or, through the exercise of ordinary care, should have known that *its employee's* conduct would subject third parties to an unreasonable risk of harm.") (emphasis added).

## C.    Medical Malpractice

Mr. Cheatwood's medical malpractice claims against Dr. Mwanza and Dr. Horan will remain for trial. "In a medical-malpractice action, the plaintiff must prove: (1) the applicable standard of care; (2) that the medical provider failed to act in accordance with that standard; and (3) that such failure was a proximate cause of the plaintiff's injuries." *Hamilton v. Allen*, 267 S.W.3d 627, 632 (Ark. App. 2007). Expert testimony is required to prove each of these elements if the asserted negligence does not lie within the jury's comprehension as a matter of common knowledge. Ark. Code Ann. § 16-114-206(a).[3] "Arkansas does not require any specific 'magic words' with respect to expert opinions, and they are to be judged upon the entirety of the opinion,

---

[3] The requirement that an expert witness be "a medical care provider of the same specialty as the defendant" is unconstitutional, *Broussard v. St. Edward Mercy Health System, Inc.*, 386 S.W.3d 385 (Ark. 2012), but the statute's requirements otherwise continue to apply to Arkansas medical malpractice cases.

not validated or invalidated on the presence or lack of 'magic words.'" *Wal-Mart Stores, Inc. v. Kilgore*, 148 S.W.3d 754, 759 (Ark. 2004).

With respect to the standard of care, the applicable standard of care for which an expert opinion may be required is "the degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider in good standing, engaged in the same type of practice or specialty in the locality in which he or she practices or in a similar locality." Ark. Code Ann. § 16-114-206(a)(1). This "locality rule" establishes the standard of care as "that of persons engaged in a similar practice in similar localities, giving consideration to geographical location, size and character of the community," where similarity is determined "from the standpoint of medical facilities, practices and advantages." *Gambill v. Stroud*, 531 S.W.2d 945, 948 (Ark. 1976). "The statute and case law are specific in stating that there must be an attestation by an expert regarding this locality or a similar one . . . ." *Young v. Gastro-Intestinal Ctr., Inc.*, 205 S.W.3d 741, 745 (Ark. 2005).

With respect to proximate cause, "[i]t is not enough for an expert to opine that there was negligence that was the proximate cause of the alleged damages . . . [t]he opinion must be stated within a reasonable degree of medical certainty or probability." *Young*, 205 S.W.3d at 745 (citing *Williamson v. Elrod*, 72 S.W.3d 489 (Ark. 2002)). "Proximate cause is that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred." *Williams v. Mozark Fire Extinguisher Co.*, 888 S.W.2d 303, 305 (Ark. 1994). Proximate cause can be shown through circumstantial evidence and "such evidence is sufficient to show proximate cause if the facts proved are of such a nature and are so connected and related to each other that the conclusion may be fairly inferred." *Wal-Mart Stores*, 148 S.W.3d at 757-58. An expert opinion is stated within a reasonable degree of

medical certainty when the opinion is "more than speculation" about cause, that it is not only medically possible but medically probable that an act or omission is the proximate cause of an injury. *Freeman v. Con-Agra Frozen Foods*, 40 S.W.3d 760, 765 (Ark. 2001) (explaining in a workers' compensation case that "if the doctor renders an opinion about causation with language that goes beyond *possibilities* and establishes that work was the reasonable cause of the injury, this should pass muster") (emphasis in original).

Dr. Horan and Dr. Mwanza argue summary judgment is appropriate because Plaintiff has failed to meet his burden on each of the medical malpractice elements. Specifically, they argue that Plaintiff's experts, Dr. Cain and Dr. Bell, failed to establish that each was familiar with the local standard of care or that Dr. Horan and Dr. Mwanza's alleged breaches of that standard were, within a reasonable degree of medical certainty, the proximate cause of Mr. Cheatwood's amputation.

### 1.    Local Standard of Care

With respect to the local standard of care, Dr. Cain testified that his specific knowledge of Fort Smith was limited to participating in a training exercise, but he has demonstrated his familiarity with the standard of care in similar localities. Dr. Cain's supplemental declaration (Doc. 163-1) details his previous experience, which was included in his CV that was disclosed to the defendants. Dr. Cain has previously practiced at a 260-bed, level III trauma center servicing a population of 192,000 and a 603-bed, level I trauma center servicing a population of 288,000. Subsequent to his deposition, Dr. Cain researched Fort Smith, which he describes as a town of approximately 88,000, and Sparks hospital, a level III trauma center with 492 beds. Based on the size, trauma center level, and similarities of facilities, Dr. Cain has demonstrated sufficient familiarity with a locality similar to Fort Smith to put his opinion testimony on the standard of care

before a jury.  Dr. Bell testified in deposition that he was unfamiliar with details about Fort Smith, but that based on his knowledge that Sparks had an emergency room and orthopedic, neurosurgery, and general surgery coverage, the standard of care here would be the same as throughout the nation. Dr. Bell's supplemental declaration (Doc. 143-1) indicates that after further research, he believes this locality to be similar to facilities he has practiced in, specifically Medical City, a 600-bed hospital that provides emergency medicine and general surgery services, as well as other specialties provided by Sparks.  Dr. Bell's declaration also emphasizes that the wound irrigation procedure is so basic and common, the need so universally understood (even by any reasonable layperson), and the necessary supplies and facilities so widespread that the standard of care in Fort Smith is indistinguishable from the national standard of care.  Dr. Bell, too, has demonstrated sufficient familiarity with the local standard of care to put his opinion testimony before a jury.

Because these expert opinions on the local standard of care depend in part on post-deposition evidence, Defendants cite cases where Arkansas courts found a plaintiff's expert failing to testify to knowledge of the particular locality or a similar one resulted in judgment for defendants.  However, most of those cases were decided after testimony at trial.  *See Plymate v. Martinelli*, 2013 Ark. 194, 2013 WL 1932918 (finding expert witness's trial testimony offering opinion as to standard of care of Arkansas as a whole insufficient to demonstrate expert was familiar with Rogers, Arkansas or similar locality); *Williamson*, 72 S.W.3d at 492 (Ark. 2002) (ruling plaintiff did not establish standard of care when expert did not testify at trial "as to what the degree of skill and learning ordinarily possessed by doctors in good standing in Little Rock or similar locales was"); *Shaffer v. Yang*, 2010 Ark. App. 97, 2010 WL 374191 (determining expert trial testimony did not show sufficient knowledge of a locality when expert testified that he did not know the size of the locality, services available, number of hospitals, etc.); *see also Gambill*,

531 S.W.2d 945 (explaining purpose of locality rule and declining to adopt national standard of care).

Although some Arkansas cases have been decided on summary judgment motions involving the locality rule, those holdings are distinguishable. In *Mitchell v. Lincoln*, the court found for defendants when the expert's affidavit was devoid of any mention of locality. 237 S.W.3d 455, 460-61 (Ark. 2006). Here, the experts' declarations reflect some familiarity with Fort Smith and Sparks, and give some detail about the size of this locality and the healthcare resources available. After the trial court in *Young v. Gastro-Intestinal Center, Inc.* found summary judgment appropriate when plaintiff's expert witnesses failed to testify regarding the standard of care in Little Rock, Arkansas, the Arkansas Supreme Court affirmed on the separate basis that no legal duty existed in the first place that could give rise to a standard of care. 205 S.W.3d at 745, 747-48. In this case, Defendants correctly avoid any argument that Dr. Horan and Dr. Mwanza had no duty at all to treat Mr. Cheatwood's traumatic injuries. Finally, in *Reagan v. City of Piggott* the court granted the defendant's motion for summary judgment because the plaintiff offered neither expert testimony nor lay opinion testimony as to the standard of care. 805 S.W.2d 636, 637-68 (Ark. 1991). Dr. Cain and Dr. Bell's expert reports, deposition testimony, and declarations reflect familiarity with localities similar to Fort Smith and the local standard of care.

Defendants next argue that both Dr. Bell and Dr. Cain incorrectly applied a national standard of care to Fort Smith. Although Arkansas law requires that the standard of care in a medical malpractice action be established in terms of the community in which the alleged malpractice occurred, or a similar locality, this does not mean that the local standard of care must be different from any existing national standard of care. For example, the Arkansas Court of Appeals has found that a plaintiff estate met its burden of proof as to standard of care when

plaintiff's expert demonstrated a familiarity with the locality at issue and "testified that for purposes of the problem at issue in this case, there are no situations where the patient would be treated differently in a different locality." *Heritage Physician Group, P.A. v. Minton*, 432 S.W.3d 682, 688-89 (Ark. Ct. App. 2014). Because the plaintiff's expert testified to familiarity with the standard of care in the relevant locality, his testimony that the standard was no different from any other locality in the nation was immaterial. *Id.*

More directly, the Arkansas Supreme Court has explained that the locality rule does not exist to "permit[] a doctor in one place to be more negligent than one in another place . . . . The similar locality rule prevents highly incompetent physicians in a particular town from setting a standard of utter inferiority for the practice of medicine there." *Gambill*, 531 S.W.2d at 949 (citing Restatement (Second) of Torts § 299A cmt. e (1965)). Although the locality rule prevents a court from taking judicial notice of a national standard of care, if the standard of care in a locality is the same standard of care throughout the country, experts may testify to that fact: "if the medical profession recognizes that there are standard treatments, which should be utilized nationwide this fact should be readily susceptible of proof under the similar locality rule, because the skill and learning should be the same and all localities would be similar." *Id.* Both Dr. Bell and Dr. Cain testified that the standard of care in Fort Smith at the time of Plaintiff's injury was the same as any other area, and both have provided evidence of familiarity with Fort Smith or similar localities and explained that nothing unique to this locality sets a standard that is different from anywhere else in the nation.[4] Because the experts' testimony, reports, and declarations demonstrate familiarity

---

[4] Defendants do not argue the standard of care applicable to Dr. Horan and Dr. Mwanza as doctors at Sparks was *in fact* any different than the standard applicable to any other doctor in any other community across the nation, but instead argue for a hypertechnical application of the locality rule that would incorrectly revert it into a "rigid, exclusionary rule of evidence, rather than a definition of a standard of care required of a physician." *Gambill*, 531 S.W.2d at 949.

with similar localities and explain the standard of care in Fort Smith for this particular situation is the same nationwide, Mr. Cheatwood has proffered sufficient expert evidence for a jury to decide what the standard of care was when Mr. Cheatwood was in their care.  The expert testimony is also sufficient to establish a triable issue on whether Dr. Mwanza and Dr. Horan met that standard.

### 2.    Proximate Cause

Defendants argue they are entitled to summary judgment because the expert opinion evidence offered by Mr. Cheatwood cannot establish within a reasonable degree of medical certainty that Dr. Horan or Dr. Mwanza's acts or omissions were the proximate cause of Plaintiff's injuries.  Mr. Cheatwood responds that triable questions of fact exist regarding proximate cause. The Court agrees.  Dr. Cain testified in his deposition that there were no guaranteed outcomes in medicine but that

> when we look at case reviews and when we look at timing of antibiotics, I think there's plenty of evidence that supports an increased risk of infection or an increased incidence of infection with delay to antibiotics, and it's true that while antibiotics are not a guarantee that you will never develop an infection, not following a timely administration of a proper antibiotic significantly increases your chances

(Doc. 112-10, pp. 14-15).  Dr. Bell testified that even with irrigation and appropriate IV antibiotics, the outcome might still have been the same, but the wound "would have a poor chance of developing infection.  (Doc. 102-3, p. 10).  The expert testimony, reports, and declarations establish a question of fact regarding whether Dr. Horan and Dr. Mwanza's acts or omissions were the proximate cause of Mr. Cheatwood's amputation.

Neither Dr. Cain nor Dr. Bell used the exact phrase "reasonable degree of medical certainty or probability" in testimony on causation,[5] but the law does not require experts to use magic words.

---

[5] In fact, in his Deposition Dr. Bell agreed with defense counsel's questions that Dr. Bell could not say "to a reasonable degree of medical certainty" or "to a reasonable degree of medical

It instead requires that an expert's opinion be that an act or omission was probably, rather than only possibly, the cause of an injury. Especially because the Court makes all reasonable inferences in a plaintiff's favor at summary judgment, examination of the opinions provided by Dr. Cain and Dr. Bell in testimony, reports, and declarations shows that those opinions satisfactorily meet this standard. Mr. Cheatwood has proffered sufficient expert testimony under Ark. Code Ann. § 16-114-206 for a jury to decide whether Defendants Dr. Horan and Dr. Mwanza should be liable for medical malpractice.

### 3. Sham Affidavit

After Dr. Mwanza and Dr. Horan filed their motions for summary judgment, Plaintiff filed declarations from his expert witnesses, Dr. Bell and Dr. Cain. (Docs. 143-1 and 163-1). The declarations contained statements regarding the expert's opinions. Dr. Mwanza and Dr. Horan argue these declarations are proffered only to create a sham dispute of fact and should not be considered.

Under Federal Rule of Civil Procedure 56(c), an entry of summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." *City of St. Joseph v.*

---

probability" that following the standard of care Dr. Bell applied would have resulted in a different outcome. (Doc. 102-3, p. 10). However, the context of the questions reveals that defense counsel misunderstood or misused those phrases to ask whether Dr. Bell was certain Defendants were the proximate cause of Mr. Cheatwood's injury rather than whether Dr. Bell believed it was more probably the case than not that Defendants were the proximate cause. The Arkansas Supreme Court "has never required that a doctor be *absolute* in an opinion . . . . Rather, this Court has simply held that the medical opinion must be more than speculation." *Freeman*, 40 S.W.3d at 765 (emphasis in original). Dr. Cain's deposition similarly reflect that defense counsel's treatment of the phrase "reasonable degree of medical certainty," and therefore Dr. Cain's understanding of that phrase, was that it meant absolute certainty, rather than just probability. (Doc. 102-4, pp. 14, 28-29, 32).

*SW Bell Telephone*, 439 F.3d 468, 475 (8th Cir. 2006) (quoting *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1363 (8th Cir. 1983)).  However, the Eighth Circuit has held that an affidavit filed by a party in opposition to a motion for summary judgment that directly contradicts the party's previous deposition testimony is insufficient to create a genuine issue of material fact. *Id.*  If "testimony under oath . . . can be abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment."  *Id.* at 476 (quoting *Camfield*, 719 F.2d at 1365).  "No party should be allowed to create 'issues of credibility' by contradicting his own previous testimony."  *Id.* (quoting *Camfield*, 719 F.2d at 1366).  However, where a declaration and a deposition are consistent, or the differences in a declaration and a deposition reflect confusion at the deposition or are an explanation of unclear portions of the deposition, a declaration should be considered.  *Id.*

Applying this standard, the declarations Dr. Bell and Dr. Cain have provided should not be rejected as a sham.  Dr. Bell testified at deposition that he was applying a national standard of care and clarified in his declaration that that is the standard of care in Fort Smith.  Dr. Bell testified at deposition that if Mr. Cheatwood's wound was properly cleaned, "Mr. Cheatwood may have avoided infection and thus, kept his leg."  (Doc. 143, p. 5).  Dr. Bell's declaration clarifies that he was not just speculating, but instead that it is his opinion that Dr. Mwanza breached the standard of care and this breach "in reasonable medical probability, resulted in the amputation of Mark Cheatwood's left leg below the knee."  (Doc. 143-1, p. 10).  The declaration states that Dr. Bell was confused as to the meaning of reasonable medical probability[6] as it was being used at his deposition, and the declaration is being used to clarify his previous testimony.  The declaration

---

[6] In light of defense counsel's own confused misunderstanding of the phrase at deposition, *see supra n.5*, Dr. Bell's confusion is understandable.

and Dr. Bell's expert report are consistent and demonstrate that even at deposition, Dr. Bell's expert opinion is that the failure to administer antibiotics with broad antibacterial coverage and irrigate the wound caused Mr. Cheatwood's amputation.

Defendants also argue Dr. Cain's declaration contradicts his previous testimony.[7]  At his deposition, when asked if he could say to a reasonable degree of medical certainty if Mr. Cheatwood would have developed an infection had an irrigation been performed, Dr. Cain testified "[n]o . . . I [cannot] attest that simple irrigation would prevent infection" and that "[t]here would be no guarantee of a different outcome.  (Doc. 112-10, p. 28-29).  Dr. Cain's declaration stated his opinion was that if an irrigation has occurred "in reasonable medical probability an infection would not have set in."  (Doc. 132-1, p. 7).  The declaration is consistent with Dr. Cain's expert report, which states that Mr. Cheatwood's amputation was a direct result of the delay in performing an irrigation and providing certain antibiotics.  Although Dr. Cain testified that an irrigation could not have guaranteed a different outcome, it is clear that Dr. Cain was testifying that there was no absolute certainty that Mr. Cheatwood's leg would have been saved.  Because Dr. Cain's declaration was not inconsistent with his testimony or the expert report, the declaration will be considered.

## IV.   Conclusion

IT IS THEREFORE ORDERED that Fort Smith HMA, LLC's motion (Doc. 109) for summary judgment is GRANTED, and all claims against Defendant Fort Smith HMA, LLC are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Dr. Horan's motion (Doc. 112) for summary judgment

---

[7] Dr. Cain's initial supplemental declaration did not contain statement that the declaration was signed under penalty of perjury, but an updated declaration was filed containing a statement that Dr. Cain signed under penalty of perjury.

22

and Dr. Mwanza's motion (Doc. 102) for summary judgment are DENIED.  Plaintiff's medical malpractice claims against these two defendants remain pending for trial.

IT IS SO ORDERED this 3rd day of December, 2020.

/s/ P. K. Holmes, III

P.K. HOLMES, III
U.S. DISTRICT JUDGE